OPINION
{¶ 1} Defendant-appellant, PPG Industries, Inc., appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, Sutphen Towers, Inc. For the following reasons, we affirm the judgment of the trial court.
 {¶ 2} This matter involves a dispute between plaintiff, a manufacturer and supplier of fire trucks, and defendant, a manufacturer and supplier of paint products, stemming from alleged problems experienced by plaintiff after utilizing defendant's paint products on several of its fire trucks. On February 27, 2003, plaintiff filed a complaint asserting causes of action for breach of an express warranty, negligent misrepresentation, and failure to refund payment for returned paint. Defendant denied liability and damages on all three causes of action.
 {¶ 3} The matter was tried to the bench in July 2004. On January 5, 2005, the trial court filed a decision and entry which included findings of fact and conclusions of law. The court found in favor of plaintiff and awarded damages of $171,821.07, plus costs. Defendant timely appeals, advancing six assignments of error, as follows:
ASSIGNMENT OF ERROR #1
The trial court erred in entering judgment for all damages sought by Sutphen, in light of the evidence showing that certain damages sought by Sutphen related to painting which Sutphen did not perform.
ASSIGNMENT OF ERROR #2
The trial court erred in finding PPG responsible for the fire truck's problems, in light of Sutphen's witnesses plainly admitting that their theory of liability against PPG was a mere "guess."
ASSIGNMENT OF ERROR #3
The trial court erred in holding the warranty's "credit only" remedy to be invalid as having failed of its essential purpose.
ASSIGNMENT OF ERROR #4
The trial court erred in disregarding the warranty's exclusion of consequential damages and in awarding such damages to plaintiff.
ASSIGNMENT OF ERROR #5
The trial court erred in completely disregarding the testimony of PPG expert witness Dan Warren.
ASSIGNMENT OF ERROR #6
The trial court erred in finding an alleged oral modification of the warranty to thus allow Sutphen to recover all damages sought, in light of the fact that many of the trucks for which Sutphen sought damages were painted 1) before Sutphen claims PPG represented it would "take care of" the problem trucks or after 2) PPG made clear in writing that, per the parties' warranty agreement, the lone remedy to buyer would be a credit toward future purchases.
 {¶ 4} Evidence presented at trial established the following. Plaintiff manufactures fire trucks in its plant in Hilliard, Ohio. The truck bodies are made of stainless steel; the cabs are made of aluminum. Plaintiff paints the truck bodies in its Hilliard facility, but sends its cabs to its chassis division in Springfield, Ohio, for painting by John Stroble, a subcontractor who leases one of plaintiff's Springfield facilities.
 {¶ 5} In the early 1990's, defendant became plaintiff's exclusive supplier of paint products for both the truck bodies and cabs. According to Julie Sutphen Phelps, plaintiff's President, defendant supplied plaintiff with more than just paint products; defendant also supplied technical expertise and training in the application of the paint products. Defendant's support services included the selection of appropriate paint products, as well as the provision of written procedures specifying safety practices, product handling, surface preparation, mixing ratios and proper application processes. Defendant also provided on-going certification of plaintiff's painting facility and paint technicians in application procedures.
 {¶ 6} With regard to Stroble's painting of the cabs, Phelps testified that plaintiff designated the type of paint to be used and defendant directed the application procedures to be used. Phelps admitted that due to environmental differences in Stroble's and plaintiff's painting facilities, the application procedures defendant provided to Stroble differ from those provided to plaintiff. She further admitted that she had no direct personal knowledge of the extent to which Stroble complied with defendant's procedures. She averred, however, that Stroble was accountable to plaintiff's chassis division, that the foreman of plaintiff's plain chassis division visited Stroble's facility daily, and that plaintiff had a significant investment in Stroble's proper painting of the cabs.
 {¶ 7} Initially, defendant supplied plaintiff with an epoxy primer known as DP, with which plaintiff had very few problems. In the late 1990's, in response to EPA regulations, defendant began producing a lead-free epoxy primer known as DPLF, and thereafter supplied it to plaintiff. At the same time, the parties entered into an exclusive supplier agreement which included a 7-year warranty on any paint work performed by plaintiff meeting defendant's certification standards. The warranty included coverage for several types of paint failure and excluded coverage under certain circumstances. In addition, the warranty set forth the following limitations and exclusions:
THESE ARE THE ONLY GUARANTEES (WARRANTIES) THAT PPG MAKES, AND ALL OTHER EXPRESSED OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATIONS, ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR USE, ARE DISCLAIMED BY PPG. This program contains the exclusive remedies with respect to any failure of the products to conform to the warranties given above or as to any injury or damage arising from any nonconforming products. In no event shall PPG be liable under any theory of recovery, whether based on negligence of any kind, contract, strict liability or tort, for any indirect, special, incidental or consequential damages, in any way related to, arising or resulting from the purchase or use of the products.
(Emphasis sic.)
 {¶ 8} The warranty also included a claims procedure which stated, inter alia, that a vehicle exhibiting evidence of a covered paint failure must be inspected by defendant and that covered repairs must be approved in advance by defendant. The claims procedure also stated that defendant would compensate plaintiff for 100 percent of the repair costs for covered defects and reimburse plaintiff for all materials and labor required to complete the repair. Finally, the claims procedure provided that all reimbursements would be compensated in the form of a credit against future purchases of defendant's materials.
 {¶ 9} Shortly after the conversion to DPLF, plaintiff began experiencing problems with the paint on trucks yet to be released from the plant. The problems included delamination (failure of the paint to adhere to the surface), dye back (loss of luster), "orange peel" (blotchy paint) and "rings" (appearance of oily rings in the paint). The same types of problems appeared on both the bodies and the cabs. At about the same time, plaintiff began receiving similar complaints from customers to whom it had sold fire trucks. Plaintiff requested that these customers provide photographs depicting their particular paint problems.
 {¶ 10} Plaintiff's paint technicians reported the problems to defendant's technical support personnel and sought advice as to how to proceed. Defendant's technical support personnel, which included at various times over the course of the relevant time period John Kitchell, Larry Mason, and Bob Estes, inspected the problem trucks and authorized plaintiff to repaint them. The trucks that had not yet been released from the plant or had been returned from plaintiff's customers were repainted by plaintiff with the on-going assistance of the technical support representatives. The trucks that were not returned to plaintiff's facility from plaintiff's customers were repainted at plaintiff's cost by paint technicians at defendant-certified remote facilities.
 {¶ 11} According to Phelps, defendant controlled the entire repainting process, which extended over a four to five-year period and included several changes in products and application procedures and processes. Phelps testified that plaintiff never altered paint products or procedures without the express direction of defendant's technical support personnel and that she trusted that defendant's product/procedure changes would remedy the problems. Phelps also testified that defendant initially did not attribute the paint problems to improper mixing procedures or application procedures; indeed, defendant told plaintiff it had properly prepared the trucks for application of the primer.
 {¶ 12} Phelps testified that defendant's technical support personnel, along with their supervisor, Dave Bowen, repeatedly assured her over the course of the repainting process that defendant would "take care" and "cover" any problems associated with the paint. (Tr. 44.) To that end, Bowen requested that plaintiff provide invoices delineating the cost of repainting.
 {¶ 13} Despite plaintiff's precise adherence to defendant's procedures, the paint problems were never fully resolved. In addition, plaintiff continued to receive complaints from other customers about paint problems. Frustrated and dissatisfied with defendant's inability to provide a workable solution, Phelps, along with paint supervisor, Joe Detty, and lead paint technician, Eric Dobbs, met in May 2002, for what Phelps described as a "final meeting" with several of defendant's representatives, including Bowen, Mason, Greg Sarnacki, and Lou Melanovich. (Tr. 54.) At the meeting, Phelps complained about defendant's failure to respond to plaintiff's repeated requests for technical support services and recertification of plaintiff's paint technicians and facility. Phelps also complained about defendant's failure to reimburse plaintiff its costs of repainting. Phelps testified that defendant assured her it would reimburse the repainting costs via cash payment rather than credit:
[I]t was absolutely concrete understandable with Dave Bowen and everybody there, and Larry Mason and everybody else, that was not going to be covered by credit. That that was going to be covered by cash, and that they were going to take care of it, just bring them up, get them taken care of, get the customer happy and we will take care of it, very clearly * * *. You know, I can't be painting trucks for how many thousands of dollars either and do credit for the next five years. They were very clear it was going to be covered.
* * *
That was where the meeting went, yes: Bring them up, paint them and we will reimburse you, not in credit. That was a discussion, one of the main discussions of the meeting is how would we be reimbursed. It was very much discussed that it would not be in credit."
(Tr. Vol. I, 129-130.)
 {¶ 14} According to Phelps, defendant's representatives seemed unnecessarily concerned with whether the problems were with the aluminum cabs (which were originally painted by Stroble) or with the stainless steel bodies (which were originally painted by plaintiff) because both the cabs and the bodies exhibited the same problems. She further testified that defendant advised plaintiff to repaint both the body and the cab of one of the problem trucks and not to have the cab repainted by Stroble. Skeptical of defendant's verbal assurances that it would "take care" of the repainting costs, Phelps requested that defendant provide written details regarding the processes and materials to use in repainting that particular truck. Phelps testified that her request for written instructions was borne of her burgeoning mistrust of defendant's verbal representations. More particularly, Phelps testified that although she still trusted defendant's sales and technical field representatives with whom she had dealt for many years (such as Kitchell and Mason), she did not trust the promises made by defendant's representatives with whom she was not well acquainted (Bowen, Milanovich, and Sarnacki).
 {¶ 15} At the meeting, defendant suggested that plaintiff repaint the problem trucks using a self-etching primer manufactured by defendant. During the summer of 2002, plaintiff began using the self-etching primer in the repainting process; no problems were reported on these trucks.
 {¶ 16} By letter dated September 9, 2002, Phelps wrote to defendant expressing concern over defendant's failure to respond to plaintiff's repeated requests to establish billing procedures associated with the repainted trucks, to provide requested summaries as to application procedures, to establish training and recertification schedules, and to provide an assessment of the cost of repainting a truck that had recently exhibited problems. On the same day, Chris Pannent, defendant's Director of Commercial Coatings, wrote to Phelps addressing plaintiff's claim for repainting four trucks. Pannent indicated that his review of plaintiff's claims revealed that the reported problems were the result of application and process failure, not product failure. Accordingly, Pannent offered to apply a materials credit to plaintiff's account and promised to support the improvements in application and processes.
 {¶ 17} Upon receipt of Pannent's letter, Phelps resolved to switch paint suppliers. Phelps testified:
This is when PPG's word changed from yes, they would pay it all in cash per Mr. Bowen, per Mr. Milanovich and everybody else. Mr. Pannent was over Mr. Bowen, and he changed the whole way we were supposed to be reimbursed in this letter. That was when I said, oh, we have been done. This is it. This is not what they promised us for the last six to eight months. They are going back on everything they told us.
(Tr. 169-170.)
 {¶ 18} Phelps also testified that "once we had been notified by [defendant] they were not going to cover anything and they weren't going to back their product the way they had promised us they would, we decided to switch manufacturers." (Tr. 100.) She stated that she voluntarily switched suppliers even after defendant provided a workable product because defendant had reneged on its promise to reimburse plaintiff's repainting costs and did not respond to her requests for training and support. (Tr. 117.) She further testified that "all communications broke down at that point. I knew they weren't backing anything by this letter and we were going to switch." (Tr. 167.) Thereafter, plaintiff returned its inventory of unused paint products. According to Phelps, defendant initially agreed to reimburse plaintiff in cash; however, defendant ultimately issued a credit memo for the total cost of the unused product.
 {¶ 19} Plaintiff's Exhibit 1 sets forth a per truck summary of repainting costs for 15 of the 16 trucks at issue, along with detailed supporting documentation for each truck, including invoices, calculator tapes, memo pad notations and computer-generated labor costs. At trial, Phelps verified the repainting costs for each of the 15 trucks. Phelps also testified that the per truck cost of repainting includes transportation and travel costs associated with delivery of trucks to and from customer locations where necessary. (Tr. 67.) According to plaintiff's Exhibit 1, plaintiff expended $138,835.83 in repainting costs. Plaintiff's Exhibit 1 also includes an estimated expenditure of $20,000 for repainting a truck sold to a New York fire department. (Tr. 95, 122.) In addition, plaintiff's Exhibit 1 includes a copy of a credit memo issued by defendant on April 17, 2003, for $12,985.84 representing the cost of unused paint products returned by plaintiff. Plaintiff's damages as depicted in plaintiff's Exhibit 1 total $171, 821.07.
 {¶ 20} Phelps admitted that she did not have the expertise in paint chemistry to determine the cause of the paint problems. She also admitted that she could not be certain that it was the DPLF primer and not one of defendant's other processes that caused the problems. She further testified, however, that the paint problems arose only after defendant changed its "system" or "process" (which included the switch to the DPLF primer), so she could only "guess" that those changes caused the problems. (Tr. 106.) She further testified that she relied on defendant to investigate and determine the cause of the problems.
 {¶ 21} Phelps acknowledged that the warranty specifically provides for reimbursement in materials credit, not cash payment, and admitted that defendant never provided written confirmation that it would reimburse plaintiff in cash for its repainting costs. Phelps was adamant, however, that both parties acknowledged that plaintiff's repainting costs were too large to be covered by credit and would therefore have to be reimbursed through cash payment.
 {¶ 22} Gary (Joe) Detty testified that as supervisor of plaintiff's Hilliard painting facility, he is responsible for all aspects of the painting process, including supply acquisition, facility maintenance, job scheduling, quality control and customer relations. According to Detty, defendant provided plaintiff with written procedures covering all aspects of the painting process. Detty testified that plaintiff displayed the procedures prominently in appropriate areas of the painting facility and followed them expressly; any product change was accompanied by a procedure change associated with that particular product. If plaintiff experienced problems with a particular procedure, defendant would instruct plaintiff on how to alter the procedure to remedy the problem. According to Detty, defendant ensured its procedures were followed through on-site technical assistance and certification of plaintiff's facility and paint technicians. Detty rejected defense counsel's suggestion that plaintiff's paint technicians were uncertified during a portion of the relevant time period. To the contrary, Detty testified that defendant repeatedly gave plaintiff verbal assurances that its paint technicians were certified.
 {¶ 23} With regard to the painting of the cabs, Detty testified that he occasionally ordered paint products for Stroble; however, he was uncertain as to whether he had ordered the paint Stroble used on the cabs of the trucks at issue. Detty also testified that Stroble's paint procedures were "a little different" than plaintiff's; however, he averred that he and Stroble were completely familiar with each other's procedures. (Tr. Vol. II, 252.)
 {¶ 24} Detty further testified that when defendant instructed plaintiff to convert to the DPLF primer, it also directed plaintiff to use an epoxy primer surfacer known as DPHS52 to cover the DPLF. Detty identified plaintiff's Exhibit 2 as defendant's product bulletin describing DPHS52, and noted that the bulletin does not list DPLF as a compatible surface over which DPHS52 should be used.
 {¶ 25} Detty further testified that as problems with the paint began to surface, he documented them in an effort to determine the cause of the problems and reported all problems to defendant. He further averred that defendant initially attributed the problems to an adverse reaction of DPLF with the primer surfacer. Detty corroborated Phelps' testimony that the paint problems at issue arose after plaintiff converted to the DPLF primer and subsided after converting to the self-etching primer.
 {¶ 26} Detty further testified that at the May 2002 meeting, Phelps requested both cash reimbursement and technical assistance for the repainting process. According to Detty, defendant averred it would "back [plaintiff] a hundred percent" by providing technical support and cash reimbursement. (Tr. 211.) According to Detty, defendant provided technical support as promised, but reneged on its commitment to provide cash reimbursement.
 {¶ 27} When asked on cross-examination how extraction of lead from the primer could have caused the problems with the paint, Detty explained: "I think the extraction of the lead made the composition of it not set up as well as the old DP with the lead in it. When you came over top of that with another epoxy, that rewetted the first coat. * * * That's why you could scratch it and smell like you painted it the day before." (Tr. 258.) Detty admitted his theory was based upon a "guess," but asserted that plaintiff's paint technicians and defendant's technical support personnel often voiced the same opinion.
 {¶ 28} Detty acknowledged that DPLF primer is produced in huge batches. He further conceded that of approximately 186 trucks manufactured and painted by plaintiff during the relevant time period, only 16, or seven to eight percent of the total, exhibited problems with the paint. Detty could not definitively explain why the remainder of plaintiff's fleet did not have the same problems. Detty acknowledged that the painting process is complicated and that many factors must be considered — temperature, humidity, air flow, mixing ratios, time sequences, and millage builds.
 {¶ 29} Eric Dobbs, plaintiff's lead painter, corroborated Detty's testimony that defendant controlled the certification process and regularly assured plaintiff's paint technicians that they were certified. Dobbs also confirmed that plaintiff consistently followed the paint procedures provided by defendant and that defendant's on-site technical support staff worked closely with plaintiff to achieve maximum customer satisfaction; this process often included changing paint products and/or procedures. Dobbs further testified that defendant initially suggested that the paint problems resulted from defective application procedures involving the DPLF primer; however, after plaintiff implemented changes suggested by defendant, the problems continued.
 {¶ 30} Plaintiff submitted the deposition testimony of John Kitchell. Kitchell had been employed by defendant as a technical field representative and worked with plaintiff during much of the relevant time period. Kitchell testified that he was involved in the training of plaintiff's paint technicians and often assisted them in all phases of the application process. He further averred that plaintiff's paint technicians strictly followed defendant's procedures; accordingly, he did not believe the paint problems resulted from improper application techniques. Kitchell attributed the problems to gaseous solvent trapped in the paint which weakened the adhesive process; he opined that the trapped solvent resulted from the tandem use of two epoxy primers, DPLF and DPHS52. Accordingly, Kitchell recommended that plaintiff switch from DPLF to a self-etching primer for use with DPHS52.
 {¶ 31} Kitchell further testified that soon after plaintiff's problems surfaced, he and Bowen met with Phelps and Detty to discuss plaintiff's warranty claims, and that Bowen committed to "tak[ing] care" of plaintiff's claims. (Depo. Tr. 41.) Kitchell opined that Bowen reneged on this promise once he became aware that more than three or four trucks exhibited the same types of problems.
 {¶ 32} Gregory Sarnacki, defendant's Midwest Regional Sales Manager, described DPLF as a "workhorse" product that is manufactured in 4,400 gallon batches which are sold to thousands of customers throughout the country. (Tr. 348.) He testified that defendant did not receive complaints from its other DPLF customers about the problems complained of by plaintiff. Sarnacki admitted that plaintiff converted to the self-etching primer because it was having problems with the DPLF primer.
 {¶ 33} Danny Warren testified as an expert for defendant. Warren conceded that he is not a chemist and did not examine any of the trucks or analyze paint samples from any the trucks. Warren opined that all the problems experienced by plaintiff were caused by problems in the application process, not by problems with the DPLF.
 {¶ 34} Louis Milanovich, defendant's Original Equipment Manufacturer Sales Manager, testified that in April 2002, Bowen requested that he conduct a line study of plaintiff's painting processes. During the May 2002 meeting with plaintiff, Milanovich outlined problems observed during the line study and identified plaintiff's faulty application processes as a potential source of the problems. According to Milanovich, the parties discussed how to resolve plaintiff's warranty claims; however, defendant never conceded any defect in its products, any obligation under the warranty, and never promised cash, rather than credit, reimbursement.
 {¶ 35} Michael Cooney, defendant's Customer Service Group Leader, identified various laboratory reports prepared from 1995 to 2003, and opined that those reports characterize both DP and DPLF as acceptable primers over properly prepared stainless steel.
 {¶ 36} Based upon the foregoing evidence, the trial court rendered judgment for plaintiff and awarded damages of $171,821.07. More particularly, the trial court concluded that the DPLF primer caused plaintiff's paint problems. The court based this conclusion on uncontroverted evidence that plaintiff's paint problems began after converting to the DPLF primer and subsided after converting to the self-etching primer. In so concluding, the court wholly rejected Warren's testimony as not credible.
 {¶ 37} As to the warranty, the court found that pursuant to R.C.1302.88, plaintiff was entitled to recover damages, including incidental and consequential damages, based upon defendant's breach of warranty. In particular, the court found that defendant's express limited warranty failed of its essential purpose because plaintiff properly attempted to avail itself of the limited warranty provisions, but defendant was either unable or unwilling to comply with the terms of the warranty. In so finding, the court expressly rejected defendant's contentions that plaintiff failed to comply with the warranty's claims procedures and that plaintiff's claims were excluded by its failure to comply with defendant's certification procedures. The court noted that defendant's credit only remedy failed of its essential purpose because it obligated plaintiff to purchase defendant's product when plaintiff was aware that the product was defective. The court further concluded that the limited warranty was amended by plaintiff's reliance upon defendant's oral representations that it would "take care" of plaintiff's problems.
 {¶ 38} Defendant's assignments of error generally assert that the trial court's judgment is against the manifest weight of the evidence. Initially, we note that judgments supported by some competent and credible evidence will not be reversed on appeal as being against the manifest weight of the evidence. Shemo v. Mayfield Hts. (2000),88 Ohio St.3d 7, 10, 722 N.E.2d 1018, 2000-Ohio-258, citing C.E. Morrisv. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261,376 N.E.2d 578, syllabus. In reviewing the trial court's judgment, every reasonable presumption must be made in favor of the judgment and findings of fact. Shemo, supra, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d. 1273. This standard of review is highly deferential and even "some" evidence is sufficient to sustain the judgment and to prevent a reversal. See Barkley v. Barkley (1997),119 Ohio App.3d 155, 159, 694 N.E.2d 989.
 {¶ 39} We also note that questions regarding the weight of the evidence and the credibility of witnesses are to be determined by the trier of fact. Cole v. Complete Auto Transit, Inc. (1997),119 Ohio App.3d 771, 777-778, 696 N.E.2d 289. The rationale underlying such deference is that the trier of fact is better able than a reviewing court to view the witnesses, observe their demeanor, gestures and voice inflections, and to use those observations in weighing credibility. See Myers v. Garson (1993), 66 Ohio St.3d 610, 615,614 N.E.2d 742; Seasons Coal, supra, at 80. Thus, a trial court is free to believe all, part, or none of the witnesses who appear before it.Rogers v. Hill (1998), 124 Ohio App.3d 468, 470, 706 N.E.2d 438.
 {¶ 40} Defendant's first assignment of error challenges the trial court's award of damages. More particularly, defendant contends the trial court improperly included in the damage award, costs associated with the repainting of truck cabs.
 {¶ 41} "It is axiomatic that every plaintiff bears the burden of proving the nature and extent of his damages in order to be entitled to compensation." Akro-Plastics v. Drake Indus. (1996), 115 Ohio App.3d 221,226, 685 N.E.2d 246, citing Columbus Fin. Inc. v. Howard (1975),42 Ohio St.2d 178, 184, 71 O.O.2d 174, 177, 327 N.E.2d 654, 658-659. Here, it is undisputed that plaintiff painted the stainless steel truck bodies but used a subcontractor, John Stroble, to paint the trucks' aluminum cabs. Defendant contends the trial court erred in awarding plaintiff damages for repainting the cabs because the record contains no evidence regarding the practices and procedures utilized by Stroble during its initial painting of the cabs. In particular, defendant notes that no evidence addressed such issues as what combination of primers and top coats were used to paint the cabs; compatibility (or lack thereof) of the paint with aluminum; Stroble's experience in using defendant's products; certification status of Stroble's paint technicians and paint facility; whether Stroble used products other than defendant's; Stroble's compliance (or noncompliance) with defendant's specified procedures; and complaints or other communications by Stroble to defendant.
 {¶ 42} Initially, we note that the record does not definitively establish that plaintiff's damage compilation includes costs for repainting truck cabs. Phelps testified that plaintiff was seeking reimbursement from defendant only for costs associated with repainting truck bodies with the exception of one truck that defendant insisted be repainted by plaintiff.
 {¶ 43} Moreover, assuming arguendo that the trial court's damage award includes the cost of repainting truck cabs originally painted by Stroble, we find that the record contains competent and credible evidence supporting such an award. While the record contains no direct evidence outlining the practices and procedures utilized by Stroble in painting the cabs, the record does include Phelps' testimony that plaintiff designated the type of paint to be used and that defendant directed the application process. Although Phelps admitted that she did not have direct personal knowledge of the extent to which Stroble complied with defendant's procedures, she averred that Stroble was accountable to plaintiff's chassis division, that the foreman of the chassis division visited Stroble's facility daily, and that plaintiff was significantly invested in Stroble's proper painting of the cabs. The record also includes Phelps' testimony that the same types of problems appeared on both the bodies and the cabs. Indeed, Phelps testified that Stroble reported similar problems with the cabs despite following defendant's procedures. (Tr. Vol. 119.) Phelps also testified that defendant reimbursed Stroble individually for repainting at least six cabs. In addition, Kitchell opined that the paint problems resulted from the tandem use of two epoxy primers, DPLF and DPHS52.
 {¶ 44} From this evidence, the trier of fact could reasonably infer that the paint products utilized on the cabs included the DPLF primer with the DPHS52, that Stroble utilized those products as directed by defendant, and that the problems resulted from the tandem use of DPLF with DPHS52 regardless of whether the products were used on the stainless steel bodies or the aluminum cabs. The foregoing evidence also permits a reasonable inference that plaintiff, through its chassis division foreman, was directly involved in Stroble's painting processes and that Stroble would not jeopardize his long-standing business relationship with plaintiff by failing to utilize the products designated by plaintiff or to adhere to the procedures outlined by defendant. The first assignment of error is not well-taken.
 {¶ 45} By the second assignment of error, defendant contends the evidence does not support a finding that defendant's paint products, specifically the DPLF primer, caused the problems with plaintiff's fire trucks. Defendant argues that the only evidence placing responsibility for the paint problems on the DPLF primer were the admitted "guesses" of Phelps and Detty. Defendant contends this testimony is too speculative and uncertain to establish proximate cause by a preponderance of the evidence.
 {¶ 46} A review of the trial court's decision reveals that the court did not base its liability finding on the testimony challenged by defendant. Rather, the court based its finding on uncontroverted evidence that plaintiff's paint problems arose after defendant switched plaintiff from the DP primer to the DPLF primer and subsided after defendant switched from the DPLF primer to a self-etching primer. The trial court's finding in this regard is supported by the testimony of both Phelps and Detty. As well, Kitchell opined that the problems resulted from the tandem use DPLF with DPSH52 and recommended changing to a self-etching primer. Thus, competent and credible evidence supports the trial court's conclusion that defendant's products, specifically the DPLF primer, proximately caused the plaintiff's paint problems. The second assignment of error is not well-taken.
 {¶ 47} As defendant's third and fourth assignments of error are interrelated, we will address them together. These assignments of error challenge the trial court's invalidation of the warranty provisions limiting plaintiff's remedies to credit only and excluding consequential damages. As noted, the warranty contained provisions expressly limiting any reimbursement owed plaintiff to credit toward future purchases and expressly excluding defendant's liability for consequential damages arising from the purchase or use of defendant's products. The trial court invalidated the credit only remedy as having failed of its essential purpose. As a result, the court found that plaintiff was entitled to recover consequential damages, which the court determined to include labor, travel, preparation and painting costs. As such, the court ordered defendant to reimburse plaintiff all the repainting costs (both actual and estimated) set forth in plaintiff's Exhibit 1 via cash payment. The court also ordered defendant to pay plaintiff $12,985.84 for the unused and returned paint products.
 {¶ 48} Defendant's breach of warranty claims are governed by R.C. Chapter 1302, Ohio's version of the Uniform Commercial Code. Pertinent to this appeal, R.C. 1302.88 provides:
(A) Where the buyer has accepted goods and given notification as provided in division (C) of section 1302.65 of the Revised Code, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
* * *
(C) In a proper case any incidental and consequential damages under section 1302.89 of the Revised Code may also be recovered.
 {¶ 49} Consequential damages are defined in R.C. 1302.89(B):
(B) Consequential damages resulting from the seller's breach include:
(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
(2) injury to person or property proximately resulting from any breach of warranty.
 {¶ 50} R.C. 1302.29(D) permits the limitation of remedies for breach of warranty:
(D) Remedies for beach of warranty can be limited in accordance with the provisions of sections 1302.92 and 1302.93 of the Revised Code on liquidation or limitation of damages and on contractual modification of remedy.
 {¶ 51} R.C. 1302.93 governs contractual modification or limitation of remedies:
(A) Subject to the provisions of (B) and (C) of this section and of section 1302.92 of the Revised Code on liquidation and limitation of damages, both of the following apply:
(1) The agreement may provide for remedies in addition to or in substitution of those provided in section 1302.01 to 1302.98 of the Revised Code and may limit or alter the measure of damages recoverable under those sections, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.
(2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
(B) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code.
(C) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not.
 {¶ 52} Defendant first contends the trial court erred in nullifying the credit only remedy. As noted, the trial court invalidated the credit only remedy on grounds that it failed of its essential purpose because it obligated plaintiff to purchase defendant's products while knowing those products were defective. Defendant challenges this conclusion on grounds that both Phelps and Detty admitted that the self-etching primer to which plaintiff converted alleviated all problems with the paint. Defendant contends that because it made available to plaintiff a product proven to be effective, defendant's reimbursement to plaintiff should be limited to product credit rather than cash payment. We disagree.
 {¶ 53} We noted, initially, the paucity of case law construing credit only remedies such as that present in the instant case. Accordingly, as suggested by defendant, we find the law construing "repair or replacement" remedies applicable, in that both call for a seller to provide an aggrieved buyer with additional products rather than cash payment.
 {¶ 54} "[T]he determination of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the [trier of fact]." Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins.Co. (1989), 42 Ohio St.3d 40, 56, 537 N.E.2d 624. Here, the record establishes that the "product" defendant supplied to plaintiff included much more than just paint; the "product" included defendant's hands-on technical expertise, support, advice and training in all phases of the painting process. Indeed, the warranty provided that defendant would train and certify plaintiff's paint technicians in defendant's application procedures and would provide continual technical information and advice. In addition, Phelps testified that the technical expertise, support and training provided by defendant was an integral part of the business relationship between the two companies. Detty also testified that defendant provided not only paint, but written procedures covering all aspects of the painting process and ensured that its procedures were followed through on-site technical assistance and certification of plaintiff's facility and paint technicians.
 {¶ 55} Phelps testified that by the time the parties met for what she considered to be a "final meeting" in May 2002, she was frustrated and dissatisfied with defendant's inability to provide a workable solution to the paint problems over a four to five-year period and complained about defendant's failure to provide promised support services and to reimburse plaintiff for its repainting costs. She further testified that all parties at the May 2002 meeting recognized that due to the extensive repainting costs incurred by plaintiff, the credit only remedy was impracticable. In addition, she testified that she did not trust the promises made by Bowen, Sarnacki, and Melanovich at the meeting because she did not have an established working relationship with them. She also testified that after she received Pannent's September 9, 2002 letter, "all communications broke down" as she came to the realization that defendant was "not going to cover anything" and was "not going to back their product the way [defendant] promised us they would." (Tr. 100, 167.)
 {¶ 56} The foregoing competent and credible evidence supports the trial court's finding that the warranty's credit only remedy failed of its essential purpose. Under the circumstances of this particular case, the credit only remedy fails of its essential purpose because it compels plaintiff to continue to utilize a "product" (which included not only paint, but on-going technical training, expertise, advice and support) supplied by an entity with whom it had a fractured, and apparently irreparable, business relationship.
 {¶ 57} Regarding consequential damages, we note that defendant concedes that Ohio adopts the view that a finding under R.C. 1302.93(B) that a remedy fails of its essential purpose renders a provision excluding consequential damages unenforceable, notwithstanding the language in R.C. 1302.93(C) that such an exclusion will fail only if "unconscionable." See Goddard v. General Motors Corp. (1979),60 Ohio St.2d 41, 396 N.E.2d 761, syllabus. (Where an express warranty limits a buyer's remedy to repair and replacement of defective parts, but the product that is the subject of the warranty is so riddled with defects that the limited remedy of repair and replacement fails its essential purpose, the buyer may institute an action to recover damages for breach of warranty under R.C. 1302.88(B) and, in a proper case, incidental and consequential damages under R.C. 1302.88(C) and 1302.89); see, also, Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc. (2000),139 Ohio App.3d 201, 210, 743 N.E.2d 464, citing Chemtrol Adhesives,Inc., supra. (Where the parties are in privity of contract, consequential damages cannot be excluded by a limited repair and replacement warranty if that warranty fails of its essential purpose.) As discussed previously, the trial court properly found that the warranty's credit only remedy failed of its essential purpose; accordingly, the provision excluding consequential damages is unenforceable under Goddard andBoyas. The third and fourth assignments of error are not well-taken.
 {¶ 58} Defendant's fifth assignment of error contends the trial court erred in disregarding the testimony of defendant's expert, Danny Warren, opining that the DPLF primer could not have caused the problems plaintiff experienced with its paint. In particular, the court noted, inter alia, that Warren admitted he was not a chemist, did not examine or test any of the trucks in question, did not perform any procedure, test or experiment on the subject paint, and did not prepare or provide a report of his opinions. In short, the trial court resolved that Warren's opinions were supported only by conclusions. The trial court had the opportunity to hear Warren's testimony and evaluate his credibility. The court wholly rejected Warren's testimony as incredible on numerous grounds. Such is the province of the trier of fact. Cole, supra. The fifth assignment of error is not well-taken.
 {¶ 59} Defendant's sixth assignment of error takes issue with the trial court's finding that the warranty's credit only provision was orally modified by defendant's repeated assurances that it would reimburse plaintiff for repainting the trucks. Defendant argues that "the court's decision can be seen as a holding that [defendant's] supposed representations estopped it from insisting on the written Agreement's credit only provisions." (Appellant's Brief on the Merits, pg. 47.)
 {¶ 60} As we noted, supra, the significance of a determination under R.C. 1302.93(B) that a warranty's exclusive or limited remedy "fail[ed] of its essential purpose" is that the buyer may then avail itself of the general remedy provisions of, inter alia, R.C. Chapter 1302. Pursuant to R.C. 1302.88, a seller's breach of warranty gives rise to the buyer's right to recover the incidental and consequential damages provided under R.C. 1302.89. Here, the trial court determined that the warranty's credit only remedy failed of its essential purpose which, in turn, invalidated the warranty's consequential damages exclusion. Thus, regardless of whether or not the warranty was orally modified, plaintiff was entitled to recover consequential damages flowing from defendant's breach of warranty. The trial court concluded that all costs associated with repainting the damaged trucks, including labor, travel, preparation and painting costs, constituted consequential damages recoverable by plaintiff under R.C. 1302.89(B)(1). As defendant does not specifically challenge that finding, the sixth assignment of error is not well-taken.
 {¶ 61} For the foregoing reasons, all six of defendant's assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Bryant and Petree, JJ., concur.