[Cite as *A.P.M. Technology, Inc. v. Ohio Penal Industries*, 2010-Ohio-6607.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

A.P.M. TECHNOLOGY, INC.

      Plaintiff/Counter Defendant

      v.

OHIO PENAL INDUSTRIES

      Defendant/Counter Plaintiff
      Case No. 2007-08899

Judge Joseph T. Clark
Magistrate Anderson M. Renick

MAGISTRATE DECISION

{¶ 1} Pursuant to Civ.R. 53, Magistrate Anderson M. Renick was appointed to conduct all proceedings necessary for decision in this matter.

{¶ 2} Plaintiff/counter defendant, A.P.M. Technology, Inc. (APM), brings this action alleging breach of contract and unjust enrichment. Defendant/counter plaintiff, Ohio Penal Industries (OPI), filed a counterclaim alleging the same two claims. The case proceeded to trial on the issues of liability and damages.

{¶ 3} APM, is a New Jersey corporation licensed to conduct business in Ohio. According to the testimony of its president, Joseph Sciaretta, APM designs and sells processing equipment whereby it represents various manufacturers that create such equipment based upon customers' specifications.

{¶ 4} OPI is a division of the Ohio Department of Rehabilitation and Correction, whose mission is to assist in the rehabilitation of inmates through work and training. OPI produces and sells a variety of products to government entities, including furniture, janitorial supplies, and inmate clothing.

**{¶ 5}**   In its plan to expand its production of a line of powder laundry detergent which is packaged in four-ounce water soluble film, on August 19, 2002, OPI issued a request for proposals (RFP) for the design, construction, and installation of a dry chemical powder processing and packaging system for use in its facility located at the Southeastern Correctional Institution in Lancaster, Ohio.   OPI sought to replace machinery that had been in service for over 20 years and had become difficult to repair. According to the proposal, "OPI buys raw, bulk chemicals, blends the chemicals and packages the chemicals for consumer use."  (Defendant's Exhibit A, Page 1.)[1]

**CONTRACT TERMS**

**{¶ 6}**   The RFP set forth the specifications for the machinery and the scope of the project, including the process by which vendors could inspect the facilities and the procedure to submit written requests for clarification.  The scope of the project was outlined in Part Four of the RFP which provides that the contractor shall be responsible for administration and coordination of the project, all engineering and design services, procurement of all new equipment and accessories, system installation, operational testing, and training for OPI staff.  (Defendant's Exhibit A, Page 9.)  Addendum No. 1 to the RFP was issued on September 13, 2002, to clarify system specifications and requirements, including production service hours ("between 6 1/2 to 8 hours, five days per week"), a production rate ("60-80, four-ounce packages per minute into water-soluble package"), and the requirement "that all chemical contact points be constructed of 316-stainless steel."

**{¶ 7}**   In addition to system specifications, the RFP sets forth certain rights and obligations of the parties, which are prefaced by the following:  *"By submitting a proposal, the offeror acknowledges that it has read this RFP, understands it, and agrees*

---

[1]The RFP had been modified by five addenda which clarified and expanded upon OPI's requirements.

*to be bound by its requirements.*" (Emphasis in original.) (Defendant's Exhibit A, Page 2.) With regard to the contract between the parties, the RFP states on page 8: "The purchase agreement between OPI and the offeror shall be a combination of the specifications, terms and conditions of the RFP with any addenda, and the offer contained in the proposal with any written clarification or changes made in accordance with the provisions herein and accepted by OPI."

{¶ 8} On or about December 2, 2003, APM responded to the RFP with a proposal which was mailed to Vicki Cox, the business administrator for OPI and author of the RFP. (Plaintiff's Exhibit 1.)[2] The proposal described the components of the dry powder processing machine as follows:

{¶ 9} "The system starts with the manually charged pre-weighed ingredients into a ribbon blender. After blending, the mix will be discharged into an inclined conveyor which delivers the blended mix to an elevated surge hopper. A second blender discharge is provided to allow for bulk packaging of the blended detergent. * * *

{¶ 10} "The surge hopper will be located directly over two (2) form/fill/seal packaging machines. * * * The blended material will be metered though two (2) variable opening knife gates to the packaging stations below.

{¶ 11} "Two form/fill and seal packaging machines will allow for packaging rates of 60 to 80 four ounce packages per minute. After packaging is completed belt style conveyors will transport the filled packets to a manual counting and boxing station." (Plaintiff's Exhibit 1.)

{¶ 12} According to APM's proposal, the packaging system would be installed with an "auger filler, and mechanically agitated feed hopper" to ensure product flow. The proposal also states that the packaging system must be "suitable for all heat sealable laminations" and that the machinery must be "shipped ready to run." (Plaintiff's

---

[2]Plaintiff's Exhibit 1 is the fourth revision to the quotation.

Exhibit 1, Page 4.)  The proposal also includes a section entitled "Terms and Conditions of Sale" that was drafted by Sciaretta.

**{¶ 13}** On January 27, 2004, OPI sent APM a purchase order and a set of drawings for the project.  (Defendant's Exhibits C, I, J, K.)  The purchase order contained the notation "purchase is in accordance with quote #22-009-001-R3 submitted by APM."[3]  The total price on the purchase order was $333,140.

**{¶ 14}** APM agreed to deliver the component parts within 12 to 14 weeks after it received the approved drawing from OPI.  (Defendant's Exhibit E, Page 1.)  Installation was to commence one week after the receipt of the materials and all components were to be installed within three to four weeks thereafter.  (Defendant's Exhibit C, Page 7.)  APM's quotation also contained a payment schedule and a list of benchmarks to be completed before payment would be tendered.  (Plaintiff's Exhibit 1, Page 7.)[4]  At some time in early April 2004, Mike Eberhardt, OPI's Chief Fiscal Officer sent Sciaretta a fax of the proposed modified payment terms.[5]  (Plaintiff's Exhibit 8.)  (Defendant's Exhibit M, Page 3.)

---

[3]In an email dated February 13, 2004, the parties acknowledge that the purchase order pertained to the fourth revision of APM's quote which was submitted on December 2, 2003.  (Defendant's Exhibit E.)

[4]The payment benchmarks included:

"* * *
"15% with the Completion of Engineering and Return of Approved Drawings
"15% Upon Completion of issuance of Purchase Orders for Major items
"15% Upon readiness of shipment for major items
"15% Upon the start of Installation
"25% Upon completion of Mechanical, Electrical installation at OPI
"10% upon completion of start-up and system testing (acceptance by OPI)
"5% upon completion of Staff Training and delivery of Manuals"

[5]The new payment benchmarks per a fax dated April 9, 2004, from Mike Eberhardt to Sciaretta states in pertinent part:

"15% - Upon Completion of Engineering and Return of Approved Drawings
"45% - Upon delivery of system to institution and start of installation
"25% - Upon completion of mechanical and electrical at OPI
"10% - Upon completion of start up and system testing — with OPI acceptance being required

**DELAY**

{¶ 15} According to APM's proposal, the project was to be completed within 19 weeks after receipt of the approved drawings.  However, after the purchase order was issued on January 27, 2004, Sciaretta notified OPI of various problems which delayed delivery of the machinery.   For example, in March 2004, Sciaretta sought to revise the terms of payment and he advised OPI that purchases for the project were "on hold" until OPI agreed to an accelerated payment schedule.  APM advised OPI that "several months" had been "lost" as a result of the payment "impasse."  (Plaintiff's Exhibit 9.) APM also notified OPI that an increase in the cost of stainless steel would impact production.   OPI subsequently agreed to accelerate the payment schedule to accommodate APM.

{¶ 16} On June 11, 2004, Sciaretta informed Rick Stevens, OPI's production manager, that production was "slowly moving ahead after restarting the project" and that "final purchases of equipment" were "in progress."  (Defendant's Exhibit L.)  In August 2004, Stevens implored APM to expedite delivery and installation of the processing system and OPI requested weekly progress reports from Sciaretta.  On August 16, 2004, Sciaretta replied that he planned to have the machinery installed in early October and that production would begin thereafter.  (Defendant's Exhibit L, Page 1.)   On November 2, 2004, Stevens demanded "a detailed schedule of delivery and installation" so that OPI could plan its production activities.  (Defendant's Exhibits M and N.)

{¶ 17} After months of delay, APM finally began installation work on January 19, 2005.  On January 27, 2005, Stevens expressed his dissatisfaction with the delays and he warned APM that if installation was not performed by March 31, 2005, he would recommend that his supervisors "pursue any and all actions needed" to remedy the situation.  On the same date, Bill Mason, OPI's product manager, notified APM of the

---

"5% - Upon completion of staff training and delivery of manuals."

"unacceptable" progress of the project, specifically stating his concerns with work that had not been completed and the poor quality of workmanship exhibited by the installation crew. (Defendant's Exhibit T.)

{¶ 18} During the installation, APM had particular difficulty with the packaging machines that were designed to dispense the processed detergent into sealed packages. Mason testified that in July 2005, after several weeks of installation, testing, and repair, Sciaretta requested assistance from Telsonics Packaging Corporation (Telsonics), the manufacturer of the machines. In August 2005, Sciaretta was continuing his attempts to repair the packaging machines when OPI informed APM that it had issued a written vendor complaint regarding the delay to the Ohio Department of Administration. According to Mason, the packaging machines were removed from OPI's facility on September 6, 2005, so that they could be repaired by Telsonics.

{¶ 19} After removing the packaging machines, Sciaretta urged OPI to share any additional costs associated with the repairs. In his correspondence with OPI regarding the progress of the repair, Sciaretta attributed the malfunction of the machines to the "conditioned atmosphere" in OPI's facility. (Defendant's Exhibit JJ.) Specifically, Sciaretta stated that the "knife mechanism" which was designed to cut the packaging film did not function properly due to moisture resulting from unsuitable temperature and humidity. Robert Starkey, OPI's industrial manager, disputed Sciaretta's assessment of the malfunction and expressed displeasure with certain "unacceptable" modifications that APM had used to "just get by." Starkey advised Sciaretta that "it is very clear that the machine was not designed to perform as to [OPI's] request" and that "these types of repairs or modifications are not acceptable and should not be considered to be something that should be permanent." (Defendant's Exhibit JJ.) On October 28, 2005, Sciaretta informed OPI that attempts to modify the packaging machines had failed and that new machines utilizing a different type of cutting mechanism were being

manufactured. Sciaretta estimated that manufacturing and shipping the new machines would require up to seven weeks.

**{¶ 20}** On December 14, 2005, Sciaretta revised his estimated delivery date and he advised OPI that the new machines would be delivered to Wilmington, Delaware "some time late in January" for testing prior to the final shipment to OPI for installation. According to Sciaretta, Telsonics would "guarantee the operation of the new units * * * in the field." (Defendant's Exhibit MM.) The new packaging machines were installed on February 22-23, 2006; however, after Sciaretta had performed many adjustments to improve the performance of the machinery, Mason determined that the processing system was unsatisfactory. Mason directed Starkey and Stevens to meet with Sciaretta and "reiterate the fact that unless the machine performs as bided [sic] that [OPI] cannot sign off on the final payment." (Defendant's Exhibit PP.) The evidence establishes that the packaging machines were still not functioning properly on February 27, 2006.

**{¶ 21}** On February 28, 2006, Mason replied to Sciaretta's request that he "sign for acceptance of the 2 machines" by stating: "Needless to say neither Bob [Starkey] nor I will be signing this paperwork due to the non-performance of these machines * * * It is evident that these machines will not perform as you have stated they would when you were awarded the bid. You have had both machines at this facility on two different occasions and on both occasions they have failed to perform as promised." Sciaretta continued to work on the packaging machines and he requested assistance from Telsonics in April 2006. On April 28, 2006, two representatives from Telsonics, Bernard Katz and Xiao Feng Sheng, worked with Sciaretta to make the machines operational.

**{¶ 22}** Sciaretta sent OPI a detailed report of the repair work that was performed which included a discussion of the problems with the packaging film that were encountered. (Defendant's Exhibit AAA.) In his report, Sciaretta acknowledged that problems with the machines still existed after the repairs were attempted. According to Sciaretta's report, he had instructed an OPI worker to make further repairs and Sciaretta

stated that OPI should take over responsibility for operating the machinery. Stevens responded to Sciaretta's report by stating that OPI had made "every attempt possible to work with [APM]" and he related that OPI would not reassemble or perform further work on the machines. (Defendant's Exhibit AAA, Page 1.) Stevens advised Sciaretta that his reply served "as notice of OPI seeking legal actions towards [APM's] inability to satisfy/complete the terms and conditions of the bid."

{¶ 23} Nevertheless, OPI permitted Sciaretta and representatives of Telsonics at least three additional opportunities to repair the packaging machines. On June 17, 2006, Sciaretta and Katz returned to OPI's facility where their efforts to improve the performance of the machinery was filmed by Dave Cordle, the superintendent of OPI's facility. (Defendant's Exhibits ZZZ1-ZZZ12.) Cordle testified that Stevens directed him to document any machinery malfunctions or production difficulties. According to Cordle, Sciaretta was unable to operate the packaging machine in a manner that met the contract specifications for either the production rate or the operating time. Cordle recorded specific problems with the mechanism that was designed to cut and seal the packets. Cordle testified that the finished packets were not sealed properly which resulted in an unacceptable product that could not be sold to OPI's customers. Cordle also documented spilled soap and damaged film that could not be reused and he testified that the resulting waste was costly.

{¶ 24} Sciaretta and Telsonics representatives returned on August 15-16, 2006; however, the same equipment malfunctions remained unresolved after this visit. Additionally, Sciaretta and Telsonics representatives had some difficulty in moving the product from the "hoppers" through the packaging system. Although the contract specified that an "agitator" would be installed to facilitate the product flow, the agitator was not delivered with the machines and Sciaretta and Telsonics representatives resorted to tapping on the hopper to maintain the flow of the product. The machines continued to malfunction with regard to cutting and sealing the finished packages.

**{¶ 25}** OPI's employees expressed concerns that mechanical malfunctions also presented safety hazards to the workers who were assigned to operate the machines. Cordle testified that the cutting mechanism required frequent adjustments and that Katz's practice of manually separating the individual packages while the machine was operating was dangerous. Cordle related that Xiao Feng Sheng had seriously injured her finger making such adjustments. Tracy Congrove, a workshop specialist who worked at the OPI facility, testified that Sciaretta fashioned a piece of cardboard to act as a temporary chute to deflect packages onto the conveyor and that the device was positioned such that it "bounced" and displaced adjacent electrical wires that were connected to a heating element. (Defendant's Exhibit ZZZ-1.) According to Congrove, the cardboard chute created a safety hazard that could result in injury to inmate workers.

**{¶ 26}** On October 19, 2006, Stevens notified APM that OPI was unable to process APM's request for final payment; that a staff meeting had been scheduled "to review the performance of the equipment"; and that Stevens would then prepare a report for his supervisors so that a "final decision" could be made "to reject or accept the equipment." (Plaintiff's Exhibit 14.) Stevens testified that in early November 2006, he told Sciaretta that OPI would not accept the machinery and that the matter had been referred to OPI's legal department. According to Stevens, OPI made some effort to purchase parts for the machines, but OPI was unable to produce any product that was suitable for sale. Stevens testified that he informed APM that the machines were unacceptable and that he directed APM to remove the machines from OPI's facility.

**SALE OF GOODS**

**{¶ 27}** APM asserts that it resolved any problems with the machines and that OPI failed to pay the balance due under the contract after it had accepted the machinery. APM further asserts that the contract involved primarily the sale of goods such that the

transaction is governed by the Uniform Commercial Code (UCC) Article Two as codified in R.C. 1302, et seq.  OPI argues that the sales provisions of UCC Article Two and R.C. Chapter 1302 are not applicable inasmuch as the contract involved "the design and fabrication of goods and the use of field labor."

{¶ 28} R.C. 1302.01 (A)(8) states, in part:  "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale * * *."  "In general, 'Ohio courts apply the predominant purpose test to mixed contracts to determine whether the predominant purpose of the contract is for the sale of goods.'"  *DeHoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, Franklin App. No. 02AP-454, 2003-Ohio-3334, ¶73, quoting *Ankle & Foot Care Centers v. Infocure Systems, Inc.* (N.D. Ohio 2001), 164 F.Supp. 2d 953.  "[T]he issue is 'whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved.'"  *Allied Erecting & Dismantling Co. v. Auto Baling Co.* (1990), 69 Ohio App.3d 502, 508, quoting *Allied Indus. Serv. Corp. v. Kasle Iron & Metals* (1977), 62 Ohio App.2d 144, 147.

{¶ 29} Sciaretta testified that he proposed suitable equipment for OPI's  project in response to the specifications of the RFP.  Although the RFP solicited bids for the "design, construction, and installation" of the packaging machines, Sciaretta testified that APM did not manufacture the processing machines and that he acted as a representative for machinery manufacturers.  According to the evidence, Sciaretta arranged for the delivery and installation of the machines after the contract was executed.  The court finds that the predominant purpose of the contract was for the sale of goods and that APM's contractual obligation to deliver, install, and test the processing machinery was incidental to the transaction.  As such, the court concludes that the UCC Article Two as codified in R.C. Chapter 1302 applies in the circumstances presented.

**ACCEPTANCE**

{¶ 30} OPI contends that it allowed APM many opportunities to comply with the terms of the contract and that it never accepted the machinery. Thus, the issue before the court is whether APM delivered suitable goods such that OPI had a duty to accept and pay in accordance with the contract. R.C. 1302.14.[6] R.C. 1302.64(A) (UCC 2-606) provides that:

{¶ 31} "Acceptance of goods occurs when the buyer:

{¶ 32} "(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

{¶ 33} "(2) fails to make an effective rejection as provided in division (A) of section 1302.61 of the Revised Code, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

{¶ 34} "(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

{¶ 35} "(B) Acceptance of a part of any commercial unit is acceptance of that entire unit."

{¶ 36} APM asserts that OPI's "acceptance" of the delivery of the machines and its payment of 70 percent of the contract balance shows that OPI had accepted the goods pursuant to R.C. 1302.64(A). However, "[a]cceptance of goods is only tangentially related to possession and, normally, the buyer will have had possession of the goods some time before he can accept them." *F. C. Mach. Tool & Design, Inc. v. Custom Design Techs., Inc.* (Dec. 27, 2001), Stark App. No. 2001CA00019; See R.C.

---

[6]The court notes that the RFP provides that OPI had the right to terminate the purchase agreement either with or without cause; cause being defined as "any time that the contractor fails to carry out its provisions or make substantial progress toward improvement under the terms specified in [the RFP] and resulting proposal. OPI shall provide the contractor with thirty (30) days' written notice of conditions endangering performance." (Defendant's Exhibit A, Page 5.) OPI complied with the notice requirement through its numerous written communications with APM.

1302.61(B)(2). Furthermore, "payment made after tender [pursuant to R.C. 1302.64(A)] is always one circumstance tending to signify acceptance of the goods but in itself it can never be more than one circumstance and is not conclusive." Comment 3 to R.C. 1302.64(A).

{¶ 37} As discussed above, the parties negotiated the payment terms and certain "benchmarks" which were to occur before scheduled payments were due. According to APM's proposal that was submitted in response to the RFP, APM was entitled to a payment equal to ten percent of the contract balance "upon completion of start-up and system testing." The payment however, was expressly conditioned upon "acceptance by OPI." (Plaintiff's Exhibit 1.) Although the parties altered the amount that was due for some of the payment benchmarks during the negotiations, the understanding that "OPI acceptance" was "required" remained as a condition precedent before OPI was obligated to pay another portion of the contract price "upon completion of start up and system testing." (Plaintiff's Exhibit 8.)

{¶ 38} The evidence established that OPI made two partial payments according to the terms of the contract, neither of which represented a payment upon completion of start-up and system testing. On April 30, 2004, OPI made an initial payment in the amount of $80,785 in response to APM's April 16, 2004 invoice for 25 percent of the contract amount that was due upon completion of engineering and approval of the system drawings. (Defendant's Exhibit GGG.) Although OPI took possession of the original machines and APM began installation on January 19, 2005, OPI did not make another payment until May 31, 2005, when it issued a warrant in the amount of $145,413, representing 45 percent of the total amount of the contract. (Defendant's Exhibit HHH.) The remaining 30 percent of the contract price, $96,942, represented payments due upon completion of mechanical and electrical installation, final start-up system testing, and staff training and system manuals. (Plaintiff's Exhibit 12.) APM sent numerous communications to OPI seeking additional payment based upon

Sciaretta's representation that the processing machines met the performance criteria specified in the contract; however, OPI's employees repeatedly replied that the machines were unacceptable with regard to both the production rate and the quality of the finished product. Thus, OPI did not signify to APM that the goods were conforming. Moreover, Stevens testified that it was OPI's practice to issue a "receiving report" when purchased items were accepted, that no equipment is accepted without such a report, and that a receiving report was not issued for the processing machines. In addition to OPI's numerous communications stating that the processing system was unacceptable, OPI's refusal to pay the invoice that was submitted by APM for "completion of start-up and system testing" shows that OPI effectively rejected the machines.

{¶ 39} R.C. 1302.60 provides in pertinent part:

{¶ 40} "[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

{¶ 41} "(A) reject the whole; or

{¶ 42} "(B) accept the whole; or

{¶ 43} "(C) accept any commercial unit or units and reject the rest."

{¶ 44} The evidence established that the processing machines did not conform to the contract specifications in several respects. Most notably, the machines were unable to produce finished product either at the specified rate (60 to 80 packages per minute) or for the duration of the specified production shift (between six and one-half and eight hours, five days per week). The testimony also showed that the bulk processing machine did not maintain an adequate product flow because it was not equipped with a mechanical agitator or auger as required by the contract. Although APM contends that the machines were capable of performing in accordance with the contract specifications, the evidence clearly shows that even after Sciaretta had replaced the packaging machines, neither he nor the manufacturer's representatives were able to operate the machines to achieve such performance. Accordingly, the court finds that the machines

did not conform to the contract specifications and that OPI never accepted the machines within the meaning of R.C. 1302.64(A), but instead rejected them as not conforming to the contract.

{¶ 45} After OPI rejected the goods, APM had a "right to cure" pursuant to R.C. 1302.52 which states:  "Cure by seller of improper tender or delivery; replacement

{¶ 46} "(A)  Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

{¶ 47} "(B) Where the buyer rejects a non-conforming tender which the seller had reasonable ground to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer, have a further reasonable time to substitute a conforming tender."

{¶ 48} The testimony and other evidence established that OPI provided APM with timely notice of nonconformity and that APM was provided with a reasonable opportunity to cure.  As discussed above, OPI notified APM on many occasions that the machines did not conform to the contract specifications and OPI allowed APM numerous opportunities to cure, both by replacing the packaging machines and by performing modifications and repairs of system components.  Stevens orally notified APM of OPI's final decision to reject the goods for their nonconformance in November 2006.  Ohio courts have held that oral notice of non-acceptance is adequate and that such notice may be implied from conduct. *Konicki v. Salvaco, Inc.* (1984), 16 Ohio App.3d 40, 43.  Consequently, APM committed a breach of the contract and, pursuant to R.C. 1302.60(A), OPI had the right to reject the goods in whole.

{¶ 49} R.C. 1302.61 sets forth "the manner and effect of rightful rejection" and provides in part:

{¶ 50} "(A) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

{¶ 51} "(B) * * *

{¶ 52} "(2) [I]f the buyer has before rejection taken physical possession of goods * * * he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

{¶ 53} "(3) the buyer has no further obligations with regard to goods rightfully rejected."

{¶ 54} As discussed above, OPI rejected the nonconforming goods in whole within a reasonable time and Stevens testified that he directed APM to remove the processing system from OPI's facility. Stevens further testified that APM has not made any attempt to remove the machines and that OPI still has possession of them.

## UNJUST ENRICHMENT

{¶ 55} APM has also set forth a cause of action for unjust enrichment. However, where damages are available for breach of a valid, enforceable contract, the equitable remedy of unjust enrichment is not available to plaintiff. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 55.

## DAMAGES

### APM (Seller)

{¶ 56} Inasmuch as OPI did not accept the goods as conforming or commit a breach of the contract, APM is not entitled to an award for either the balance of the contract price or any incidental damages. See R.C. 1302.83, 1302.84.

### OPI (Buyer)
### Exclusion of Remedies

{¶ 57} As an initial matter regarding OPI's damages, the court notes that APM's proposal became a part of the contract and includes a provision for exclusion of remedies which provides, in pertinent part, as follows: "The buyer agrees that except where such limitations and exclusion are specifically prohibited by applicable law, the BUYER'S SOLE AND EXCLUSIVE REMEDY AGAINST APM SHALL BE FOR THE REPAIR OR REPLACEMENT OF DEFECTIVE PARTS AS PROVIDED IN SECTION 5 and 7, and that no other remedy (including but not limited to incidental, special, indirect, or consequential damages for lost profits, lost sales, injury to persons or property, or any other loss) shall be available to him, whether the remedy is based upon direct action, suit for contribution or indemnity, or otherwise, whether arising out of contract, tort, product liability, strict liability in tort, or otherwise. This exclusive remedy shall not be deemed to have failed of its essential purpose *as long as APM is willing and able to repair or replace defective parts in the prescribed manner*." (Emphasis added.)

{¶ 58} R.C. 1302.93 provides, in pertinent part:

{¶ 59} "(A) Subject to the provisions of divisions (B) and (C) of this section * * *:

{¶ 60} "(1) the agreement * * * may limit or alter the measure of damages recoverable * * * as by limiting the buyer's remedies * * * to repair and replacement of nonconforming goods or parts.

{¶ 61} "(2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

{¶ 62} "(B) *Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in Chapters 1301.*, 1302., 1303., 1304., 1305., 1306., 1307., 1308., and 1309. of the Revised Code.

{¶ 63} "(C) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." (Emphasis added.)

{¶ 64} OPI has the burden of proving that APM's failure to repair the processing machines within a reasonable time caused the exclusive remedy to fail of its essential purpose. "'The determination of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the [trier of fact].'" *Sutphen Towers, Inc. v. PPG Indus., Inc.*, Franklin App. No. 05AP-109, 2005-Ohio-6207, ¶54, quoting *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 56.

{¶ 65} "'The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of the view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty. * * * The limited, exclusive remedy fails of its purpose and is thus avoided under Sec. 2-719(2) [R.C. 1302.93], whenever the warrantor fails to correct the defect within a reasonable time.'" *Slagle Farms, Inc. v. Int'l Harvester Co.* (May 10, 1979), Crawford App. No. 3-79-2, quoting *Beal v. General Motors Corp.* (1973), 354 F.Supp. 423, 426.

{¶ 66} As discussed above, OPI allowed APM numerous opportunities both to repair and to replace malfunctioning components in the processing system. After substantial delays in delivering and installing the system, OPI advised APM of specific problems with the production capacity of the machines and the quality of the finished product. After many attempts to make repairs, APM essentially abandoned its work and attempted to instruct OPI employees to reassemble the packaging machinery. The court finds that the exclusive remedy of replacement or repair of defective parts under the purchase agreement failed of its essential purpose in that APM did not correct the defects in the machines within a reasonable time after such defects were discovered

and brought to its attention. Accordingly, pursuant to R.C. 1302.93(B), the limited, exclusive remedy was avoided and OPI is entitled to recover damages as provided in Chapter 1302.

**CONTRACT PAYMENTS**

{¶ 67} In its counterclaim OPI seeks damages representing the amount of the payments that were made to APM.

{¶ 68} Both R.C. 1302.85 and 1302.86 provide a buyer who has rightfully rejected goods with certain remedies. Specifically, R.C. 1302.85, states, in pertinent part:

{¶ 69} "(A) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, as provided in section 1302.70 of the Revised Code, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid:

{¶ 70} "(1) 'cover' and have damages under section 1302.86 of the Revised Code as to all the goods affected whether or not they have been identified to the contract * * *

{¶ 71} "* * *

{¶ 72} "(C) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody and may hold such goods and resell them in like manner as an aggrieved seller as provided in section 1302.80 of the Revised Code."

{¶ 73} As concluded above, OPI rightfully rejected the machinery after paying 70 percent of the contract price, $226,198. Pursuant to R.C. 1302.85(A), OPI is entitled to

cancel the contract and recover the partial payment of the purchase price. Inasmuch as OPI still has rightful possession of the machines, it has a security interest in the goods for the partial payment made on the purchase price. R.C. 1302.85(C). However, when reimbursed for that partial payment, APM may remove the machines from OPI's facility.

**REPLACEMENT COSTS**

{¶ 74} With regard to the packaging machines, pursuant to R.C. 1302.86, OPI had the right to procure substitute goods, or cover.

{¶ 75} R.C. 1302.86 states:

{¶ 76} "(A) After a breach within the preceding section, the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

{¶ 77} "* * *

{¶ 78} "(C) Failure of the buyer to effect cover within this section does not bar him from any other remedy."

{¶ 79} OPI did not cover by purchasing substitute goods; however, OPI asserts that it is entitled to recover the cost of replacing the malfunctioning packaging machines as damages. In support of its counterclaim, OPI presented two price quotes from John R. Wald Company, Inc., in the amounts of $270,000 and $409,000, for the delivery and installation of packaging machines which OPI contends are comparable to the packaging machines that were provided by APM. (Defendant's Exhibits CCCC and DDDD.) Starkey testified that the quotes were submitted in response to OPI's proposal for replacement packaging machines which could be adapted to the processing system that APM had installed.

{¶ 80} The official comment to R.C. 1302.86 (UCC 2-712) "expresses the policy that cover is not a mandatory remedy for the buyer. The buyer is always free to choose between cover and damages for non-delivery under the next section." OPI is entitled

either to damages for non-delivery of conforming goods or to cover, but not both remedies. See R.C. 1302.87 and Official Comment 5 thereto. Inasmuch as OPI chose not to purchase substitute goods, it is entitled only to damages for non-delivery.

{¶ 81} Pursuant to R.C. 1302.87, "the measure of damages for non-delivery * * * by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages." However, "[t]he injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally courts have required greater certainty in the proof of damages for breach of contract than for a tort." *Kinetico, Inc. v. Independent Ohio Nail Co.* (1984), 19 Ohio App.3d 26, 30, citing Restatement of the Law 2d, Contracts (1981) 144, Section 352.

{¶ 82} APM contends that the estimates obtained by OPI do not represent the market price for a replacement packaging machine. Sciaretta testified that the cost of the packaging machine represented only $32,000, approximately ten percent of the total cost of the processing system. The court notes that lowest quote obtained by OPI represents over 80 percent of the of the contract price for the entire system. Furthermore, the quotes contain a notation which explains that the quotes are intended "for budget purposes only, not a firm fixed quote." Moreover, as stated above, OPI rejected the nonconforming goods in whole and the quotes obtained by OPI were not sufficient to establish damages for non-delivery in that they pertain only to the packaging machines and do not reflect a market price for the entire processing system. Based upon the evidence, the court finds that OPI has failed to prove with reasonable certainty that the market value of the machinery is different from the contract price and, consequently, it has failed to prove that there is any "difference between the market price for the machines at the time when it learned of the breach and the contract price."

**INCIDENTAL AND CONSEQUENTIAL DAMAGES**

{¶ 83} R.C. 1302.86(B) provides that "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in section 1302.89 of the Revised Code, but less expenses saved in consequence of the seller's breach."

{¶ 84} R.C. 1302.89 defines the consequential and incidental damages that are recoverable as follows:

{¶ 85} "(A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

{¶ 86} "(B) Consequential damages resulting from the seller's breach include:

{¶ 87} "(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise * * *."

{¶ 88} OPI seeks damages for overtime costs and lost profits associated with APM's failure to meet its contractual obligations.

{¶ 89} OPI presented Starkey's testimony in order to establish incidental damages regarding weekend overtime wages that were paid to employees during APM's attempts to repair the machines. However, Starkey testified that he did not know "the exact figures" for the overtime costs and neither Starkey nor any other witness testified regarding wage and time data which would allow the court to compute such costs with reasonable certainty. Accordingly, OPI cannot prevail on its claim for damages for overtime costs.

{¶ 90} With regard to damages for consequential damages or lost profits in a breach of contract action, OPI must prove: "(1) profits were within the contemplation of

the parties at the time the contract was made, (2)the loss of profits is the probable result of the breach of the contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *Combs Trucking, Inc. v. Internat'l. Harvester Co.* (1984), 12 Ohio St.3d 241, paragraph two of its syllabus. The requirement that damages for breach of contract must be proved with reasonable certainty "is especially rigid in cases where lost profits are sought; the plaintiff must substantiate any lost profit figure by calculations based on facts. A mere assertion that he would have made a particular amount in profits is not sufficient." *Sharp v. Clark* (May 20, 1992), Darke App. No. 1285, citing *Battista v. Lebanon Trotting Ass'n* (1976), 538 F.2d 111, 119; *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 68.

**{¶ 91}** OPI's claim for lost profits is problematic in that it presented no basis to establish such damages other than Starkey's testimony regarding the "average" revenue that was generated using the old processing system and his estimate that OPI could have "at least doubled" revenues had the new system functioned as expected. Thus, OPI did not present sufficient information from which the court can calculate damages for lost profits. Furthermore, Starkey's estimate was apparently based upon the assumption that OPI would have had a ready market for the planned increase in production. Consequently, the court finds that OPI has failed to show with sufficient certainty not only the amount of damages for lost profits, but also the fact that such damages existed.

**{¶ 92}** Based upon the foregoing, the court finds that OPI is entitled to damages in the amount of $226,198 on its counterclaim for recovery of the partial payment of the contract price. Accordingly, judgment is recommended in favor of defendant/counter plaintiff in the amount of $226,198.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections,*

*any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*


_____
ANDERSON M. RENICK
Magistrate

cc:


Christopher P. Conomy                    Linda R. Van Tine
Assistant Attorney General               1410 Central Avenue
150 East Gay Street, 18th Floor          Sandusky, Ohio 44870
Columbus, Ohio 43215-3130

Mark A. Stuckey
607 Bimini Drive
Sandusky, Ohio 44870

AMR/cmd
Filed November 30, 2010
To S.C. reporter January 4, 2011